# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

FANNIE MAE,

    Plaintiff,

v.

WILLIAM J. CREAGAN III, *et al.*,

    Defendants.

Case No. 2:11-cv-00451-LDG (PAL)

**ORDER**

    Presently before the Court is Plaintiff Fannie Mae's Motion for Summary Judgment. (Doc. #25). Defendants William Creagan and Matthew H. Rattner filed a response in opposition (Doc. #31), and Fannie Mae filed a reply (Doc. #32).

    Deutsche Bank Berkshire Mortgage, Inc. (Deutsche Bank), predecessor-in-interest to Fannie Mae, loaned money to H&B V, LLC (H&B) to purchase an apartment complex. Creagan and Rattner personally guaranteed that H&B would meet its re-payment obligations, with a maximum liability of $300,000. Subsequently, H&B failed to make the December 1, 2009, payment. Fannie Mae now seeks $300,000 in recourse against Creagan and Rattner. Having considered the arguments of the parties and the record, the court will deny Fannie Mae's motion.

**Statement of Facts**

On or about December 31, 2007, Deutsche Bank, predecessor-in-interest to Fannie Mae, loaned a principal sum of $5.9 million to H&B for the purchase of 1001 Dumont Blvd, Las Vegas, Nevada (Property). *See* Fixed+1 Multifamily Note. In connection with this transaction, the parties entered into a series of contracts including: the Note, the Guaranty, the Multifamily Deed of Trust and Security Agreement (Security Instrument), and the Completion/Repair and Security Agreement (Completion Agreement) which documents cumulatively will be referred to as the Loan Documents. Because the Property was in disrepair at the time of the transaction, Deutsche Bank and H&B entered into the Completion Agreement. *See* Affidavit of Carol King at ¶ 7 (CM/ECF Document #26-1). The Completion Agreement required H&B to set aside $200,000.00 in an escrow account which represented 115 percent of the estimated cost of the repairs. *Id*. As H&B conducted these repairs, they were to receive reimbursements from the escrow account at the discretion of the lender. *See* Completion Agreement at 1(a) and 4.

After the parties executed the Loan, Deutsche Bank assigned its beneficial interests in the Loan Documents to Fannie Mae by executing an Assignment of Collateral Agreements and Other Loan Documents. *See* Assignment of Collateral Agreements.  In order to "induce [Deutsche Bank] to make the Loan to [H&B]," Creagan and Rattner executed the Guaranty. *See* Guaranty at page 1. Pursuant to the terms of the Guaranty, the Defendants' maximum liability was not to exceed $300,000.00. *See* Guaranty Section 2. The Guaranty states:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, and the full and prompt performance when due, all of the following:
> (a) The entire Indebtedness.
> (b) All costs and expenses, including reasonable fees and out of pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

*See* Guaranty Section 2. The Guaranty borrows the definition for "entire Indebtedness" from the Security Agreement which reads: "Indebtedness means the principal of, interest on, and all other amounts due at any time under, the Note, this Instrument or any other Loan Document." *See* Security Agreement Section 1(k). By executing the Guaranty, the Defendants personally guaranteed full and prompt payments due under the Loan Documents up to $300,000.00.

The Guaranty Section 2 governed the conditions requisite for release from the Guaranty. Guaranty Section 2 reads in relevant part:

> Additionally, this Guaranty shall remain in effect until the "Termination Date" which shall be the earlier of the date (a) the completion of 90% all Immediate Repairs identified on Exhibit A to the satisfaction of Lender, as determined by Lender in its sole determination . . . . Notwithstanding anything herein to the contrary, on the Termination Date, upon written request by Borrower and Lender's written approval in accordance with the terms hereof, this Guaranty shall become null and void and of no further force and effect and shall be deemed released with no further act of the parties.

According to the Note, H&B was required to make a payment on December 1, 2009. *See* Affidavit of Carol King at ¶ 10. H&B failed to make this payment and thus under the Loan Documents this omission constituted an Event of Default. Previously, H&B and Defendants completed sufficient repairs to satisfy the first of the three requirements under the Guaranty. *See* Affidavit of Rattner at ¶ 30-32 (CM/ECF Document #31-2). On December 2, 2009, Defendants provided written notice to Deutsche Bank of their intention to be released from the Guaranty. *See* Affidavit of Rattner at ¶ 33. Due to default on the Note, Fannie Mae completed its foreclosure of the Property and ultimately took title to the Property via credit bid on August 24, 2010 for $2,950,000. *See* Affidavit of Carol King at ¶ 13. As of August 24, 2010, the total amount due on the Loan was in excess of $6 million.

On February 1, 2011, Fannie Mae brought this action in Nevada State Court. On March 25, 2011, Defendants removed this action to the United States District Court of

Nevada. The case then proceeded into discovery. On October 4, 2012, Fannie Mae filed the current motion for summary judgment.

## Legal Standard

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson*, 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

4

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the moving party can meet its initial burden on summary judgment "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact. Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The allegations or denials of a pleading, however, will not defeat a well-founded motion. Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). That is, the opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

**Legal Discussion**

The Nevada Supreme Court has stated that general contract interpretation principles apply to interpret guaranty agreements. *Dobron v. Bunch*, 125 Nev. 460, 464 (Nev. 2009). A contract is ambiguous if it is reasonably susceptible to more than one interpretation. *Shelton v. Shelton*, 119 Nev. 492, 497 (Nev. 2003). In the absence of ambiguity or other

factual complexities, contract interpretation presents a question of law that the district court may decide on summary judgment. *Galardi v. Naples Polaris, LLC*, 129 Nev. Adv. Op. 33 (Nev. 2013). However, if there is an ambiguity requiring extrinsic evidence to discern the parties' intent, summary judgment is improper. *Dickenson v. State, Dept. of Wildlife*, 110 Nev. 934, 937 (Nev. 1994). The best approach for interpreting an ambiguous contract is to delve beyond its express terms and examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties. *Shelton* 119 Nev. at 497.

The Court finds that the Guaranty is ambiguous because the provision that governs the release from the Guaranty has more than one reasonable interpretation. Provision 2 of the Guaranty reads in relevant part:

> Additionally, this Guaranty shall remain in effect until the "Termination Date" which shall be the earlier of the date (a) the completion of 90% all [sic] Immediate Repairs identified on Exhibit A to the satisfaction of Lender, as determined by Lender in its sole determination . . . . Notwithstanding anything herein to the contrary, on the Termination Date, upon written request by Borrower and Lender's written approval in accordance with the terms hereof, this Guaranty shall become null and void and of no further force and effect and shall be deemed released with no further act of the parties.

This provision raises several questions as to when the Guaranty becomes "null and void and of no further force and effect and shall be deemed released with no further act of the parties." The Court's cursory review of these two sentences suggests at least several interpretations, some of which are arguably reasonable.

First, the Court could interpret this provision as establishing that the guarantors would be liable for a breach by the borrower at least until the date on which 90% of repairs were completed. The guarantors could be released from this obligation, but <u>only</u> on the date on which 90% of repairs were completed, and <u>only</u> if the borrowers made a written request and obtained a written release <u>prior</u> to that date. Pursuant to this reading, the guarantor would remain liable for any breach, regardless of whether the breach occurred

6

before or after 90% of repairs were completed, if the borrower failed to request a release prior to the completion of 90% of repairs. That is, this reading would suggest that the failure to make the written request would render impossible a subsequent release for any breach, regardless of when it occurred.

Second, the Court could interpret this provision as establishing that the guarantors would be liable for a breach by the borrower occurring prior to the date on which 90% of repairs were completed. The guarantors could be released from this obligation, but <u>only</u> on the date on which 90% of repairs were completed, and <u>only</u> if the borrowers made a written request and obtained a written release <u>prior</u> to that date. Pursuant to this reading, the guarantor would remain liable for any breach that had occurred prior to the date on which 90% of repairs were completed if the borrower failed to request a release prior to the completion of 90% of repairs.

Third, the Court could interpret this provision as establishing that the guarantors would be liable for a breach by the borrower at least until the date on which 90% of repairs were completed. The guarantors could be released from this obligation, but <u>only</u> on the date on which 90% of repairs were completed, and <u>only</u> if the borrowers made a written request and obtained a written release <u>on that same date</u>. Pursuant to this reading, the guarantor would remain liable for any breach, regardless of whether the breach occurred before or after 90% of repairs were completed, if the borrower failed to request a release, and the lender failed to approve such request, on the date that 90% of repairs were completed. That is, this reading would also suggest that the failure to make the written request on the specific date on which 90% of the repairs were completed would render impossible a subsequent release for any breach, regardless of when such breach occurred.

Fourth, the Court could interpret this provision as establishing that the guarantors would be liable for a breach by the borrower prior to the date on which 90% of repairs were completed. The guarantors could be released from this obligation, but <u>only</u> on the date on

7

which 90% of repairs were completed, and <u>only</u> if the borrowers made a written request and obtained a written release <u>on that same date</u>. Pursuant to this reading, the guarantor would remain liable for any breach that had occurred before 90% of repairs were completed if the borrower failed to request a release on the date that 90% of repairs were completed. The consequence of failing to make such a request would be to leave the guarantors liable for any breach that occurred prior to the 90% completion date.

Fifth, the Court could interpret this provision as establishing that the guarantors would be liable for any breach occurring prior to the date on which 90% of repairs were completed, but not for any breach occurring after that date. The guarantors would remain liable for any breach occurring prior to the 90% repair completion date until the borrowers made a written release request that was approved, in writing, by the lender. Pursuant to this reading, the guarantors would be released from liability for any breach occurring prior to the 90% repair completion on the date the borrower made a written request subsequently approved, in writing, by the lender.

Sixth, the Court could interpret this provision as establishing that the guarantors are liable for any breach occurring prior to the date on which 90% of repairs were completed, and are also liable for any breaches occurring after that date until the borrowers made a written release request that is approved, in writing, by the lender. The guarantors would remain liable for any breach, whether occurring before or after the 90% repair completion date, until the date on which the borrower made a written request that is subsequently approved, in writing, by the lender. However, upon such written request, subsequently approved in writing, the guarantors would be released from liability for any breach that had occurred.

Seventh, the Court could interpret this provision as establishing that the guarantors are liable for any breach occurring prior to the date on which 90% of repairs were completed, and are also liable for any breaches occurring after that date until the borrowers

made a written release request that is approved, in writing, by the lender. The guarantors would remain liable for any breach, whether occurring before or after the 90% repair completion date, until the date on which the borrower made a written request that is subsequently approved, in writing, by the lender. However, upon such written request, subsequently approved in writing, the guarantors would be released from liability for any breach that had occurred subsequent to the 90% repair completion date, but would continue to be liable for any breach that occurred prior to the 90% repair completion date.

Eighth, the Court could interpret this provision as Fannie Mae apparently suggests. That is, the guarantors are liable for any breach occurring prior to the date on which 90% of repairs were completed, and are also liable for any breaches occurring after that date until the borrowers made a written release request that is approved, in writing, by the lender. The guarantors would remain liable for any breach occurring prior to the written request. As such, the only effect of the written (and approved) request would to release the guarantors from liability for any breach occurring after the written request.

Ninth, the Court could interpret this provision as establishing that the guarantors are liable for any breach occurring prior to the date on which 90% of repairs were completed, but not for any breach occurring after that date, and the subsequent written request (and its written approval) would establish the date on which 90% of repairs were completed.

The Court has no opinion as to which, if any, of these possible constructions is that intended by the parties. The Court has noted them only to establish that the provision is ambiguous and precludes a grant of summary judgment. Nevertheless, the Court is skeptical of any interpretation that ultimately requires concluding that the "Termination Date," (the date on which the guaranty becomes null and void and of no further force and effect) refers to some date other than established in the first sentence of the provision, that is, the date on which 90% of repairs were completed.

Accordingly,

1  THE COURT **ORDERS** that Fannie Mae's Motion for Summary Judgment (#25) is
2  DENIED.

4  DATED this ___11___ day of September, 2013.

_____
Lloyd D. George
United States District Judge